1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9   Curtis Bohnert,                      )   No. CV-08-2303-PHX-LOA
                                         )
10               Plaintiff,              )   **ORDER**
                                         )
11   vs.                                 )
                                         )
12                                       )
     Jeffrey Mitchell; George A. Burke; Kevin)
13   Carr; Maricopa County; Maricopa County)
     Sheriff Joe Arpaio; State of Arizona;)
14   Roger Vanderpool, Director of the)
     Arizona Department of Public Safety, )
15                                       )
                 Defendants.             )
16                                       )
     _____)
17

18          This § 1983 action comes before the Court on Defendants' summary judgment

19   motions on the issue of qualified immunity. Viewing the facts in the light most favorable to

20   Plaintiff Curtis Bohnert ("Plaintiff"), the Court finds that (1) Department of Public Safety

21   ("DPS") Officer Jeffrey Mitchell and Maricopa County Deputy Sheriffs George A. Burke

22   and Kevin Carr ("Deputies") had probable cause to arrest Plaintiff, (2) did not use

23   unconstitutionally excessive force in arresting Plaintiff, and (3) a reasonable officer

24   confronting the circumstances faced by Officer Mitchell and Deputies Burke and Carr on

25   March 5, 2008, could have reasonably, but mistakenly, concluded that the use of force,

26   including the use of a Taser, was necessary. Accordingly, the Court will grant Officer

27   Mitchell's and Deputies Burke's and Carr's motions for summary judgment on qualified

28   immunity.

**I. Introduction.**

On December 17, 2008, Plaintiff commenced this action under 42 U.S.C. § 1983 by filing a Complaint against Deputy Burke and Deputy Carr and Maricopa County Sheriff Joe Arpaio (collectively "County Defendants").  Plaintiff also sued the State of Arizona, DPS Officer Jeffrey Mitchell, and DPS Director Roger Vanderpool (collectively "State Defendants"), alleging, *inter alia*, that the Defendants violated Plaintiff's rights under the Fourth and Fourteenth Amendments by using unreasonable or excessive force.

On May 21, 2010, the County Defendants filed a Motion for Summary Judgment on Qualified Immunity. (Doc. 75) Plaintiff filed a timely response, doc. 87, to which the County Defendants replied, doc. 94. On June 22, 2010, the Court ordered the County Defendants to file a supplemental brief, not exceeding three pages, addressing whether the Ninth Circuit's June 18, 2010 decision in *Bryan v. MacPherson*, 608 F.3d 614 (9th Cir. 2010) applies to the issue of qualified immunity and the facts of this case. (Doc. 79) The County Defendants complied on July 7, 2010.[1] (Doc. 86)

On June 24, 2010, the State Defendants filed a Motion for Summary Judgment, raising the defense of qualified immunity; the alleged inapplicability of Plaintiff's § 1983 claim brought pursuant to the Americans With Disabilities Act; and the alleged absence of liability for DPS Director Vanderpool. Plaintiff filed a timely response, doc. 96,[2] to which the State Defendants replied, doc. 99.

In the interest of clarity, this order will only address the common issue of qualified immunity of DPS Officer Mitchell and Deputies Burke and Carr. The other issues raised by Defendants will be addressed in subsequent orders.

---

[1] The Court accepts the County Defendants' supplemental brief filed seven days late as a non-prejudicial clerical error. (Doc. 85)

[2] The Court granted Plaintiff additional time to file his response due to his counsel's unexpected medical issues. (Doc. 92)

**II. Background**

This case is a sad, unfortunate encounter between law enforcement officers, attempting to do their jobs and protecting the motoring public, and a long-time diabetic, traveling alone on business, who experienced the sudden onset of severe hypoglycemia, causing him to unconsciously operate his motor vehicle the wrong way on a high-speed freeway. Fortuitously, no one was killed.

On March 5, 2008 at approximately 11:00 a.m.,[3] DPS Officer Jeffrey Mitchell was in the DPS office in Gila Bend, Arizona, which is located approximately 68 miles southwest of Phoenix, when the DPS radio dispatcher telephoned, advising Officer Mitchell there was a vehicle going the wrong way on Interstate 8[4] near milepost 115, west of Gila Bend.[5] Interstate 8 ("I-8") is the main freeway connecting Phoenix and central Arizona to San Diego and southern California. The DPS communications center had received several

---

[3] The Complaint alleges the incident occurred at 10:30 a.m. (Doc. 1 at 5, ¶ 14) The official DPS report of the events giving rise to this lawsuit, authored by Officer Mitchell, indicates it occurred at 11:13 a.m. (County Defendants' Statement of Facts ("CDSOF"), Exhibit ("Exh") A, doc. 76-1 at 3). The exact time of the incident, however, is immaterial to the issue of qualified immunity.

[4] Plaintiff disputes the State Defendants' allegation that Plaintiff "began to drive westbound in the eastbound lanes of the freeway" because the "State Defendants do not refer to a specific admissible portion of the record to support this allegation, citing Rule 56(e)(1), Fed.R.Civ.P. (Plaintiff's Statement of Facts in Response to the States' Motion for Summary Judgment ("PSOF"), doc. 93 at 1-2, ¶ 4)  Plaintiff repeats this dispute several times.

Plaintiff's dispute is not well-taken. "Under Ninth Circuit and Arizona law . . . judicial admissions bind a party to the allegations made in its pleading, provided the pleadings have not been amended." *Parker v. Witasick*, 2007 WL 772546, * 5 (D.Ariz. 2007); *American Title Insurance v. Lacelaw Corp*., 861 F.2d 224, 226 (9th Cir. 1988); *Doss v. Apache Powder Co.*, 430 F.2d 1317, 1323 (5th Cir. 1970) ("Prohibiting defendant from introducing prior pleadings and cross-examining one of the plaintiffs about them was error. 'Abandoned pleadings . . . are properly admissible as ordinary declarations or admissions against interest.'"); Rule 801(d)(2), Federal Rules of Evidence.

[5] State Defendants' Statement of Facts ("SDSOF"), deposition of Officer Mitchell, Exh B, at p. 44, line 12 to p. 45, line 1; p. 60, lines 4 – 18, doc. 82 at 2, ¶ 5.

calls from drivers on the freeway reporting the wrong-way vehicle and the area in which it was traveling. Considering this an urgent "potentially lethal" situation based upon his experience involving wrong-way drivers, some resulting in fatalities, Officer Mitchell immediately left and drove west of Gila Bend on I-8 with his emergency lights and siren operating.[6] Common sense dictates this was a serious freeway emergency.[7]

After the wrong-way vehicle, a silver Toyota pick-up truck with a camper shell driven by Plaintiff, was first reported to DPS, it traveled approximately five miles going west in the eastbound lanes of I-8 until the vehicle stopped after it likely struck an unknown object,[8] which caused a flat right front tire.[9] Plaintiff had previously been in Gila Bend on business before entering I-8 the wrong way. Photographs taken at the scene show Plaintiff's vehicle at rest, pointing west, straddling the inside eastbound lane and the inner asphalt shoulder on a freeway bridge that crosses an arroyo (desert wash).[10] The freeway at this point

---

[6] Id. at p. 45, line 1 to p. 46, line 18; p. 47, line 14 to p. 48, line 7; p. 135, line 6 to p. 136, line 5.

[7] Plaintiff disputes as speculation Officer Mitchell's testimony that he observed eastbound vehicles "take evasive action" because of Plaintiff's westbound vehicle. Id. at ¶ 10; PSOF at ¶ 10. Although Officer Mitchell's opinion testimony is admissible under Rule 701 Fed.R. Evid., it is immaterial for summary judgment because wrong-way freeway drivers pose an extreme danger to the motoring public regardless of whether other drivers take evasive action.

[8] Plaintiff disputes his "vehicle struck some kind of object." PSOF at ¶ 7 , doc. 93 at 2. What may have caused the right front tire's "damage" or to go flat is immaterial to the issue of qualified immunity. Deposition of Jeffrey Mitchell, Exh B, at p. 51, lines 9-11. It is reasonable to believe the right front tire hit an object because Plaintiff's vehicle could not have likely traveled on I-8 as far as it did in the condition depicted in the photographs identified in the next footnote.

[9] SDSOF, ¶¶ 6, 7; Exh B, at p. 50, lines 10-18; Exh C, deposition of George Burke: Exhs 3 & 4 (identified at p. 88 of deposition), photos attached to SDSOF.

[10] Id.

has narrower shoulders due to the bridge with guardrails on both sides of the roadway.[11]

When Officer Mitchell arrived at the scene, Plaintiff's vehicle was stopped, the driver's window was down, and Plaintiff was sitting behind the steering wheel.[12] It is undisputed that Plaintiff turned off his vehicle's engine and placed the keys on the dashboard.[13] As Officer Mitchell approached the driver's side, he noticed the set of keys on the dashboard, so he reached in, grabbed the keys, and put them in his pocket. He was uncertain whether those keys operated the vehicle, but he secured them as a precaution.[14] Defendant Maricopa County Deputy Sheriff George Burke ("Deputy Burke") arrived at the scene moments after Officer Mitchell.[15] Deputy Burke looked into Plaintiff's vehicle and confirmed that other than the driver, there was nothing in the vehicle - such as weapons or a passenger - that could pose a threat to the officers.[16]

At about the time he grabbed the keys, Officer Mitchell noticed that Plaintiff's eyes appeared "glassed over" or "glossy."[17] Suspecting Plaintiff "could be" impaired by alcohol or drugs[18] and uncertain what he was about to encounter,[19] Officer Mitchell asked

---

[11] *Id*.

[12] *Id*. at ¶¶ 8, 9, and 11. Plaintiff does not dispute these factual statements. PSOF at ¶¶ 8, 9, and 11.

[13] SDSOF at ¶ 11. Plaintiff does not recall being on the freeway before he felt vibration in his steering wheel. He does recall feeling that vibration, pulling over to the right side of the roadway, stopping his vehicle, placing the keys on the dash, and looking for something to eat. PSOF at ¶ 112, deposition of Plaintiff, Exh I, pp 49-50, doc. 84-10 at 4.

[14] SDSOF at ¶ 11.

[15] *Id*. at ¶ 9.

[16] PSOF at ¶ 86, Exh D, deposition of George Burke, pp. 14-15.

[17] SDSOF at ¶ 12. Plaintiff does not dispute these facts. PSOF at ¶ 12.

[18] It is undisputed that upon a glance into the cab and bed of the camper shell, Officer Mitchell saw various items but, by inference, he did not see any alcohol containers or illegal

Plaintiff what he was doing. Plaintiff responded, "Trying to stay out of trouble."[20] Officer Mitchell next asked Plaintiff to step out of the vehicle, to which Plaintiff replied, "No." Officer Mitchell then opened the driver's door and ordered Plaintiff to step out of his vehicle.[21]  Plaintiff again said, "No."  Officer Mitchell then seized Plaintiff's left wrist in an attempt to physically remove Plaintiff from the vehicle. Plaintiff resisted Officer Mitchell's efforts to pull him from the vehicle, repeatedly shouting, "No, no, no!"[22] Based on Plaintiff's refusal to comply with Officer Mitchell's orders to exit the vehicle, Officer Mitchell decided to arrest Plaintiff.[23]  Deputy Burke overheard Officer Mitchell's request for Plaintiff to step out of the vehicle, and shortly after that, he heard Officer Mitchell tell Plaintiff that he was under arrest.[24]

Plaintiff and Defendants dispute much of what occurred after Officer Mitchell attempted to place Plaintiff under arrest while in his vehicle.

Defendants contend that after informing Plaintiff he was under arrest, Officer Mitchell and Deputy Burke, and eventually Deputy Carr, used reasonable and necessary

---

drug paraphernalia. County Defendants' Statements of Fact ("CDSOF") at ¶ 4; deposition of Officer Mitchell, Exh B, p. 51, lines 16-21; Plaintiff's Separate Statement of Facts Opposing County Defendants' Statements of Fact ("PSOFOCDSOF") at ¶ 4, doc. 84.

[19] CDSOF at ¶ 6, doc. 76-2 at 8 (p. 63 of Officer Mitchell's deposition), doc. 76-2 at 12 (p. 136: "Q: And when you approached the scene, dispatch hadn't told you what to expect[,] correct?  You didn't know from dispatch if you were dealing with an escaped prisoner; someone who was armed and dangerous; a meth addict; someone who was violent[,] did you? A: that's correct."). Plaintiff does not dispute Plaintiff's "glassed over" eyes "could indicate that he's impaired[.]" PSOFOCDSOF at ¶ 6, doc. 84 at 3.

[20] SDSOF at ¶ 12. Plaintiff does not dispute these facts. PSOF at ¶ 12.

[21] SDSOF at ¶ 13. Plaintiff does not dispute these facts. PSOF at ¶ 13.

[22] SDSOF at ¶ 13. Plaintiff does not dispute these facts. PSOF at ¶ 13.

[23] SDSOF at ¶ 15. Plaintiff does not dispute these facts. PSOF at ¶ 15.

[24] SDSOF at ¶ 16. Plaintiff does not dispute these facts. PSOF at ¶ 16.

force under the circumstances to place Plaintiff in physical custody. When Plaintiff refused to cooperate and exit the vehicle as directed by Officer Mitchell, Deputy Burke reached in the vehicle from the passenger side and used his right arm to grab Plaintiff around the neck while Officer Mitchell pulled on Plaintiff's left wrist.[25] The officers were unsuccessful in removing Plaintiff from the vehicle because Plaintiff grabbed the steering wheel with his right hand and locked his left leg against the kick panel behind the foot pedals.[26] Realizing that even two officers were not going to extricate Plaintiff from his "locked" position, Officer Mitchell removed his Taser from his belt, showed the Taser to Plaintiff and said something about it.[27] In response to Officer Mitchell's commands and display of the Taser, Plaintiff clenched "his hands on the . . . steering wheel, lifted his feet up, spread them apart and stomped them on the floorboard."[28] Officer Mitchell then used the Taser in "drive stun" mode to deliver a shock to Plaintiff's left leg above the knee.[29] Plaintiff screamed in pain and immediately stopped bracing himself with his left leg which allowed the officers to successfully pull Plaintiff out of the driver's side of the vehicle.[30]

---

[25] SDSOF at ¶ 17. Plaintiff disputes the allegation that Deputy Burke began pulling Plaintiff out of his vehicle before Officer Mitchell used his Taser on Plaintiff. PSOF at ¶ 17, Exh 3, deposition of Deputy George Burke, p. 26, line 22 through p. 28, line 20, doc. 93 at 3. Although Plaintiff does not provide the Court with page 28 at Exh 3, page 29, lines 7-11 supports the Defendants' factual statement. If there is an inconsistency on this sequencing, it is immaterial to the issue of qualified immunity.

[26] SDSOF at ¶ 17. Plaintiff does not dispute this factual allegation. PSOF at ¶ 17.

[27] Deputy Burke does not remember specifically what Officer Mitchell said to Plaintiff about the Taser. State Defendants' Reply, Deputy Burke's deposition, Exh 1, p. 18 lines 11-13, doc. 99-1 at 6.

[28] *Id*. at p. 18, lines 14-21.

[29] CDSOF at ¶ 11. Plaintiff does not dispute Officer Mitchell's testimony that if Plaintiff had complied with Officer Mitchell's directions, he would not have used the Taser to obtain Plaintiff's compliance. PSOFOCDSOF at ¶ 11.

[30] SDSOF at ¶ 18. Plaintiff disputes that Officer Mitchell's use of his Taser caused Plaintiff to stop bracing himself and allowed the officers to extract him, citing Deputy Burke's

One or both of the officers[31] and Plaintiff, face first,[32] fell out of the vehicle onto the asphalt of the high-speed (inside or number one) eastbound lane of the freeway.[33] Plaintiff landed face down and held his arms tightly under his body,[34] resisting the two

---

testimony that Deputy Burke pulled Plaintiff out of the vehicle only after Officer Mitchell stopped using the Taser. PSOF at ¶ 18.  Plaintiff does not provide the Court with page 27 of Deputy Burke's deposition but page 29 at line 7 to line 11 supports Plaintiff's claim of a factual dispute. This factual inconsistency is, however, is immaterial to the issue of qualified immunity.

[31] Plaintiff contends Deputy Burke testified that he remained standing when Plaintiff was pulled out of the vehicle but Plaintiff does not attach page 32 of Deputy Burke's deposition in PSOF to support this alleged disputed fact in ¶ 19. It is immaterial, however, to the issue of qualified immunity whether one or both officers fell out of the vehicle.

[32] Deputy Burke's deposition at p. 31, lines 22-24, doc. 93-4 at 14.

[33] SDSOF at ¶ 18. Plaintiff disputes whether eastbound traffic on I-8 posed a threat at this point to the three men as they struggled "up against the centerline" or middle of the two-lane roadway. Traffic had completely stopped on the inside lane because Deputy Burke intentionally stopped and parked his vehicle in this lane to stop Plaintiff's vehicle from driving the wrong way any further, to protect himself, and to block approaching traffic in that lane. Plaintiff's Supplemental State of Facts to State Defendants' Statement of Facts ("PSSOFTSDSOF"), ¶¶ 153-157, doc. 95 at 2. Also see photographs identified in footnote 9. Either way no reasonable juror could conclude it was not a overall dangerous situation to law enforcement, Plaintiff, emergency personnel, and the motoring public with high-speed (a 75 m.p.h. speed limit) freeway traffic either stopped or moving slowly and traffic backing up as law enforcement tried to place Plaintiff in custody.

[34] There is no non-speculative, admissible testimony to support Plaintiff's argument that Plaintiff's "arms were pinned under his chest," doc. 87 at 2, due to the weight of the officers on his back such that Plaintiff was unable to willingly place his arms behind his back and prevented the officers from pulling them out. Plaintiff's "sanitized version of the incident," *Wilkinson*, 610 F3d at 551-52, does not create a disputed question of material fact. The officers were having difficulty pulling Plaintiff's arms out from underneath Plaintiff because Plaintiff was intentionally resisting their efforts to handcuff him just like Plaintiff did in resisting the officers efforts to remove him from the vehicle. SDSOF at ¶ 21, deposition of Officer Mitchell, Exh B, at p. 150, lines 11-15. Also see Deputy Burke's testimony, PSOF, Exh 3, at p. 34, line 16 to p. 35 at line 13. Plaintiff's evidence on this issue is "merely colorable" and fails to create a jury question. *Anderson*, 417 U.S. at 249-50 (citations omitted).

officers' efforts to handcuff him.[35] According to Officer Mitchell, Plaintiff was screaming and kicking while on the ground and.[36] At about this time, Deputy Carr arrived to assist Deputy Burke and Officer Mitchell to place Plaintiff in handcuffs.[37] Officer Mitchell tried to control Plaintiff's legs so he would not get kicked. He used his Taser twice in the drive-stun mode on the back of Plaintiff's right leg in the thigh area which "helped to straighten out his legs." This allowed Officer Mitchell to gain control of Plaintiff's legs by sitting on them.[38]

Using physical force,[39] Deputy Burke unsuccessfully pulled on Plaintiff's left

---

[35]SDSOF at ¶ 21.

[36] *Id.* at ¶¶ 20-21. Plaintiff disputes Officer Mitchell's testimony and contends Plaintiff "never fought, struggled, wrestled, flailed about or kick[ed] his feet or legs. [Plaintiff] simply laid still." PSOF at ¶¶ 20-22, 107, doc. 93. Because Plaintiff has no memory of what occurred on the ground, Plaintiff cites Deputy Burke's deposition to create an inconsistency in between the officers' testimony. When asked what was Plaintiff doing from the time Plaintiff landed on the ground to the time he handcuffed Plaintiff's left wrist, Deputy Burke said "nothing. . . [I] didn't see him [moving] in any fashion" *Id.*, Deputy Burke's deposition, Exh 3, p. 35 at line 22 to p. 36 at line 4, doc. 93-4. It is clear, however, that later in Deputy Burke's deposition that Deputy Burke said he wasn't looking at Officer Mitchell when Plaintiff was kicking his legs before Officer Mitchell controlled his legs by sitting on them. Deputy Burke's deposition, Exh 3, p. 43, line 5 to p. 45, line 15. Page 57 is missing from PSOF.

[37] SDSOF at ¶ 21, Exh B, deposition of Officer Mitchell, at p. 53, line 19 to p. 54, line 6; PSOF at 77, doc. 93 at 9.

[38] Deposition of Officer Mitchell, Exh B, p. 53, lines 13-18, doc. 82-3 at 12.

[39] Deputy Carr used his expandable metal baton to try to pry Plaintiff's right arm out from underneath his body without success. PSOF at ¶ 78. Deputy Carr then struck Plaintiff on the right arm or shoulder "two or three" times with his fist in an attempt to get Plaintiff's right arm out from underneath him. PSOF at ¶ 104. Also see, Exh 2, deposition of Officer Mitchell, at p. 53, line 23 to p. 54, line 6; p. 96, line 20 to p. 97, line 15. As Officer Mitchell testified, "I'm assuming it was as hard as he could. It looked like it was pretty hard." *Id.* at p. 54, lines 3-6. Plaintiff's representation in PSSOFOCDSOF at ¶ 8 of doc. 84 that "Mitchell actually testified that Carr did indeed hit Plaintiff with the baton and as Mitchell later testified, it was the other deputy [Carr] and not Burke who struck Plaintiff with the baton on the right shoulder "two or three" times[]" appears to be an mistaken recitation of the record

arm to remove it from underneath Plaintiff and Deputy Carr tried to pull Plaintiff's right arm from underneath him without success. Officer Mitchell then used his Taser one last time to Plaintiff's kidney area to overcome Plaintiff's resistance to the Deputies' attempts to handcuff Plaintiff. After tasing Plaintiff the last time,[40] Deputy Burke was able to pull Plaintiff's left arm from underneath him and roll Plaintiff to one side in order for Deputy Carr to place Plaintiff's right arm behind his back, handcuff him, and roll him over onto his back.[41] After being handcuffed, Plaintiff was placed in leg restraints.[42] Plaintiff struggled[43] with the three officers outside of the pickup truck for about four to five minutes before the officers could restrain him with handcuffs and leg restraints.[44]

Unfortunately, Plaintiff "sustained multiple and serious injuries" during the course of his arrest.[45] Plaintiff was never charged with a crime nor cited for a civil traffic violation.

Plaintiff has not presented any evidence, nor raised any reasonable inference from the evidence, that Officer Mitchell, Deputy Burke or Deputy Carr knew that Plaintiff

---

by Plaintiff. Whether Deputy Carr struck Plaintiff's right arm or right shoulder is immaterial on the issue of qualified immunity.

[40] It is undisputed that Officer Mitchell tased Plaintiff a total of four times, all in stun-drive mode. PSOF at ¶ 82.

[41] PSOF at ¶¶ 101-102, 105, doc. 93 at 12.

[42] SDSOF at ¶ 22. According to Deputy Burke, Officer Mitchell placed leg irons on Plaintiff's ankles and then connected them to Plaintiff's handcuffs by another set of handcuffs, so that he was restrained in a "hobbled" manner. PSOF at ¶ 108-109, Burke deposition, Exh 3 at p. 47, line 23 to p. 48, line 11.

[43] Plaintiff disputes whether he struggled or "wrestled" with the officers while he was on the ground. PSOF at ¶ 21.

[44] CDSOF at ¶ 9, doc. 76 at 4. Plaintiff does not dispute the time that it took for these facts to occur. PSSOFOCDSOF at ¶ 9. The Court agrees with Plaintiff that counsel for the County Defendants and State Defendants include too many facts in each paragraph of their factual statements which make them more difficult to address.

[45] PSOF at ¶¶ 83-85, doc. 84 at 17-18.

was not under the influence of alcohol or drugs, legal or illegal, while Plaintiff was operating his vehicle westbound in the eastbound lanes of I-8 until after Plaintiff was arrested and secured on the ground.[46] At no time before he was placed in handcuffs and physical custody did Plaintiff inform the officers that he was having a medical emergency or was a diabetic.[47] The parties agree that as Plaintiff was leaving Gila Bend on his way to make sales calls to his customers in western Arizona,[48] Plaintiff, an insulin-dependent diabetic, suffered "severe hypoglycemia,"[49] also known as insulin shock,[50] from low blood sugar, resulting in confusion, disorientation[51] and almost a complete loss of memory.[52] Plaintiff has no memory

---

[46] Plaintiff does not dispute that, until this incident with Plaintiff, Officer Mitchell and Deputy Burke have never witnessed anyone experiencing a diabetic episode, impairment or reaction. SDSOF at ¶ 31; PSOF at ¶ 31.

[47] Deposition of Officer Mitchell, Exh B, p. 137-138, CDSOF, doc. 76-2 at 12-13; SDSOF at ¶ 29. Plaintiff does not dispute these facts. PSOF at ¶ 29.

[48] On March 5, 2008, Plaintiff, now aged 56, was a long-time employee of Southwest Rubber and Supply engaged in outside sales of rubber products to industrial users. SDSOF at ¶ 1; Complaint at ¶ 13, doc. 1.

[49] PSOF at ¶ 144.

[50] "Hypoglycemia means low blood sugar. It occurs when there is not enough sugar or glucose in the blood. It is also called insulin shock or insulin reaction. . . ." Univ. of Iowa website at http://www.uihealthcare.com/topics/diabetes/diab4396.html (September 7, 2010). Also see, PSOF at ¶ 113.

[51] According to Plaintiff, when he experiences a hypoglycemic episode, it comes on suddenly without warning. He described it as a "dreamlike" state. PSOF at ¶¶ 113, 116. Plaintiff's expert witness, Kevin P. Corley, M.D., avers that symptoms of a hypoglycemic episode "can include mental disorientation leading to incorrect choices when operating an automobile, alteration in behavior including oppositional behavior, alteration in speech pattern, and a refusal to cooperate with individuals when requested to do so." *Id.* at ¶ 143.

[52] Plaintiff concedes he has no memory of anything that occurred from the time that Officer Mitchell approached his vehicle until he was lying handcuffed and shackled on the pavement. PSOF at 45, doc. 93 at 6.

of his physical struggle with the police officers.[53] Significantly, it was not until shortly after Plaintiff was in handcuffs and leg restraints that Plaintiff started saying, "[H]elp me, help me. Somebody help me."[54]  Officer Mitchell called for an ambulance as soon as Deputy Burke placed the leg restraints on Plaintiff.[55]

Once Plaintiff was in custody, Officer Mitchell and Deputy Burke conversed and Officer Mitchell "wonder[ed] what [Plaintiff was] on."[56] Each of them realized that Plaintiff did not smell of alcohol or marijuana. At that moment, Officer Mitchell thought Plaintiff might be intoxicated on pills.[57] While waiting for the ambulance to arrive, Officer Mitchell conducted a partial search of the passenger compartment of Plaintiff's vehicle. He found a jacket on the front seat, and in patting it down he felt a small bag that seemed to contain pills. When Officer Mitchell pulled the bag out from the jacket pocket, he found that it was a packet of mini M&M candies. At this time and for the first time, Officer Mitchell thought Plaintiff might be diabetic. The thought occurred to Officer Mitchell because he has a diabetic relative who carries small quantities of candy with him to help maintain his blood sugar level.[58] At Officer Mitchell's request, either Deputy Burke or Deputy Carr searched Plaintiff's front pant's pocket and found "glucose tablets."[59]

When the ambulance arrived, Officer Mitchell informed the medical personnel

---

[53] *Id.*

[54] Exh B, deposition of Officer Mitchell, p. 54, lines 13-22, doc. 76-2 at 6.

[55] *Id.* at p. 54, lines 21-22.

[56] *Id.*, lines 13-17.

[57] SDSOF at ¶ 25. Plaintiff does not dispute this factual statement. PSOF, ¶ 25.

[58] SDSOF at ¶ 26. Plaintiff does not dispute this factual statement. PSOF at ¶ 26, doc. 93 at 4.

[59] SDSOF at ¶ 27, doc. 82 at 7. Plaintiff does not dispute this factual statement. PSOF at ¶ 27, doc. 93 at 4. Deputy Carr testified, however, that he found the glucose tablets. PSOF at ¶ 128.

that he suspected that Plaintiff was a diabetic and that they should check his blood sugar right away.[60] After testing his blood, the medical personnel advised Officer Mitchell that Plaintiff's blood sugar was low.[61] Plaintiff contends he had no indication or warning that he was becoming hypoglycemic when he was driving his vehicle on March 5, 2008.[62] In the past, when Plaintiff experienced an extreme hypoglycemic event (extremely low blood sugar) approximately ten times, it was only at night when he was asleep.[63] On March 5, 2008, Plaintiff did not wear a diabetic identification bracelet but he did carry a card in his wallet which identified him as a diabetic.[64]

**III. Summary Judgment Standard**

A district court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, which he believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party who must demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for

---

[60] PSOF at ¶ 89, Exh 2, Mitchell deposition, p. 55, lines 15-17.

[61] *Id*. at ¶ 90.

[62] *Id*. at ¶ 40.

[63] *Id*.  at ¶¶ 36-37.

[64] PSOF at ¶¶ 49-50; SDSOF at ¶ 30.

the non-moving party. *Id*. at 250; *Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Rule 56(e) compels the non-moving party to "set out specific facts showing a genuine issue for trial" and not to "rely merely on allegations or denials in its own pleading." Fed.R.Civ.P. 56(e); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986). The opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Arizona v. Cities Serv. Co*., 391 U.S. 253, 288-89 (1968). However, Rule 56(c) mandates the entry of summary judgment against a party who, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

When considering a summary judgment motion, the district court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed.R.Civ.P. 56(c). At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. But, if the evidence of the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50.

It is well-established that on the issue of qualified immunity, district "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (citations omitted). "However, when the facts, as alleged by the non-moving party, are unsupported by the record such that no reasonable jury could believe them, we need not rely on those facts for purposes of ruling on the summary judgment motion." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (citing *Scott*, 550 U.S. at 380); *City of Vernon v. Southern Cal. Edison Co.*, 955 F.2d 1361, 1369 (9th Cir.

1992), *cert. denied*, 506 U.S. 908 (1992) (a party cannot defeat a summary judgment motion by producing a "mere scintilla of evidence to support its case."); *Neely v. St. Paul Fire and Marine Ins. Co.*, 584 F.2d 341, 344 (9th Cir. 1978) (while summary judgment is improper if sufficient evidence supporting a claimed factual dispute is adduced, "this evidence must be 'significantly probative' of the disputed fact") (citations omitted).

**IV. Title 42 U.S.C. § 1983**

By its terms, Title 42 U.S.C. § 1983 does not create any substantive rights. Rather, it provides a vehicle for vindicating federal rights conferred elsewhere.  *Alright v. Oliver*, 510 U.S. 266 (1994).  Section 1983 allows individuals to recover damages and other relief for deprivations of constitutional rights that occur under color of state law. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 330-31 (1986).  To state a claim under § 1983, a plaintiff must allege a violation of rights secured by the Constitution or laws of the United States and must show that the alleged deprivation was committed by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42 (1988).  The availability of adequate state remedies does not bar § 1983 claims based on violation of specific constitutional guarantees. *Daniels*, 474 U.S. at 337-38 ("If the claim is . . . (a violation of one of the specific constitutional guarantees of the Bill of Rights), a plaintiff may invoke § 1983 regardless of the availability of a state remedy.") (Stevens, J., concurring). Plaintiff's Complaint alleges, *inter alia*, Defendants violated his constitutional rights guaranteed by the Fourth and Fourteenth Amendments for the "unlawful seizure and arrest of [P]laintiff [without] the requisite probable cause" and "the use of excessive and unnecessary force" against him. (Doc. 1, ¶ 34 at 11)

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., Amend. IV.  The Fourth Amendment and other provisions of the Bill of Rights are applied to the states through the due process clause of the Fourteenth Amendment. *McDonald v. City of Chicago*, ___ U.S. ___, 130 S.Ct. 3020, 3032-33 (2010); *Duncan v. Louisiana*, 391 U.S. 145, 147-48 (1968); *Mapp v. State of Ohio*, 367 U.S. 643 (1961)

- 15 -

1   (exclusion of evidence seized in violation of search and seizure provisions of Fourth
2   Amendment applies to states by due process clause of Fourteenth Amendment).

3   **V. Qualified Immunity**

4              Even if a law enforcement officer violates an individual's constitutional rights,
5   the officer may be protected by the doctrine of qualified immunity. Qualified immunity
6   shields a public official from individual liability for civil damages under § 1983 so long as
7   his conduct does not "violate clearly established statutory or constitutional rights of which
8   a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).
9   "Qualified immunity balances two important interests - the need to hold public officials
10  accountable when they exercise power irresponsibly and the need to shield officials from
11  harassment, distraction, and liability when they perform their duties reasonably. The
12  protection of qualified immunity applies regardless of whether the [police officer's] error is
13  a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."
14  *Pearson v. Callahan*, ___ U.S. ___, 129 S.Ct. 808, 815 (2009) (citation and internal quotation
15  marks omitted). Qualified immunity "provides ample protection to all but the plainly
16  incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341
17  (1986). As qualified immunity provides immunity from suit and is not merely a defense to
18  liability, it is important to "resolv[e] immunity questions at the earliest possible stage in
19  litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

20             In *Saucier v. Katz*, 533 U.S. 194, 200 (2001), the Supreme Court mandated a
21  two-step sequence for resolving qualified immunity claims. First, the district court must
22  decide whether the facts that a plaintiff has alleged or shown make out a violation of a
23  constitutional right. Second, the district court must decide whether the right at issue was
24  "clearly established" at the time of the defendant's alleged misconduct. Even assuming the
25  existence of a constitutional violation, an officer is entitled to qualified immunity if the
26  constitutional right was not clearly established at the time of the alleged violation. The
27  Supreme Court's 2009 decision in *Pearson*, 129 S.Ct. at 815, overruled *Saucier's* analytical
28  framework so that the decisional sequence required by *Saucier* is no longer mandatory. A

district court is now "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S.Ct. at 818. The Court, however, elects to examine both elements of qualified immunity in this order.

**VI. Constitutional Right Allegedly Violated**

**1. Probable Cause to Arrest**

Defendants contend there was probable cause to arrest Plaintiff. (Docs. 75 at at 8; 81 at 4) Plaintiff disagrees that probable cause existed to arrest Plaintiff. (Doc. 87 at 5) "While they may have had reasonable suspicion for an investigatory stop to question [Plaintiff] regarding a possible DUI, the Officers hastened to arrest him, based upon their faulty assumptions, without taking time to investigate their legitimate suspicions." (*Id*. at 6) While it agrees with Plaintiff that the officers did not have probable cause to arrest Plaintiff for DUI, the Court disagrees there was no probable cause to arrest Plaintiff for other crimes.

"A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Dubner v. City and County of San Francisco*, 266 F.3d 959, 964-65 (9th Cir. 2001) (citation omitted). An arrest must be supported by probable cause. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). "Conversely, a police officer who arrests without probable cause has committed a civil rights violation." *Turner v. County of Washoe*, 759 F.Supp. 630, 634 (D.Nev. 1991). In determining whether an arrest was lawful under the Fourth Amendment, "[f]ederal law asks only whether the officers had probable cause to believe that the predicate offense, as the state has defined it, has been committed." *Williams v. Jaglowski*, 269 F.3d 778, 782 (7th Cir. 2001). "[T]he standard of probable cause applie[s] to all arrests, without the need to balance the interests and circumstances involved in particular situations." *Atwater*, 532 U.S. at 354. (internal quotation marks and citation omitted). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Id*.

The Supreme Court has declared the "[p]robable cause exists if 'at the moment the arrest was made . . . the facts and circumstances within [the police officer's] knowledge and of which [the police officer] had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [the arrestee] had violated [the law]." *Hunter*, 502 at 228 (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "Probable Cause exists when the facts and circumstances within the officer's knowledge are sufficient to cause a reasonably prudent person to believe that a crime has been committed." *Lassiter v. City of Bremerton*, 556 F. 3d 1049, 1053 (9th Cir. 2009). Also see, *Peng v. Penghu*, 335 F.3d 970, 976 (9th Cir. 2003); *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994).

The district court "should ask whether the [police officers] acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact." *Hunter*, 502 U.S. at 228. In other words, "[u]nder settled law, [Officer Mitchell, Deputy Burke or Deputy Carr] are entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest [Plaintiff]." *Id*.  "The standard for probable cause is an objective one - the 'arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause . . . .'" *Peschel v. City of Missoula*, 686 F.Supp.2d 1107, 1118 (D.Mont. 2009) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (citations omitted)). Moreover, "[t]he validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested [or not charged with a crime at all] is irrelevant to the validity of the arrest. We have made clear that the kinds and degree of proof and the procedural requirements necessary for a conviction are not prerequisites to a valid arrest." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979) (citations omitted); *Wright v. City of Philadelphia*, 409 F.3d 595, 603-04 (3d Cir. 2005) (noting it is irrelevant to the probable cause analysis what crime a suspect is eventually charged with, and finding no constitutional violation where probable cause supported one of the four charges on which the defendant was arrested); *Beauregard v. Wingard*, 362 F.2d 901, 903 (9th Cir. 1996). Whether a police officer has probable cause

to arrest is ascertained by looking at the facts known to the officer at the time of the arrest. *Turner*, 759 F.Supp. at 634. "It has long been established that a police officer who arrests with probable cause is immune from suit in a civil rights action." *Id*. at 633.

In Arizona, a police officer may, without an arrest warrant, arrest a person if the police officer has probable cause to believe:

> 1.  A felony has been committed and probable cause to believe the person to be arrested has committed the felony.
>
> 2.  A misdemeanor has been committed in his presence and probable cause to believe the person to be arrested has committed the offense.
>
> \*          \*          \*          \*
> 4. A misdemeanor or a petty offense has been committed and probable cause to believe the person to be arrested has committed the offense. . . .
>
> **B.** A peace officer may stop and detain a person as is reasonably necessary to investigate an actual or suspected violation of *any traffic law* committed in the officer's presence and may serve a copy of the traffic complaint for any alleged civil or criminal traffic violation. . . .

Arizona Revised Statute ("A.R.S.") § 13-3883(A) (2010) (emphasis added)[65]; *State v. Keener*, 206 Ariz. 29, 75 P.3d 119, 121 (Az.Ct.App. 2003) (police officers had authority to arrest defendant for misdemeanor offense of driving with a suspended license, even though they did not witness defendant driving, provided they had probable cause to believe offense had occurred and defendant had committed it). Arizona "courts have long recognized that collective knowledge of law enforcement officers may be considered to establish probable cause." *Id*.

Under Arizona law, resisting arrest by a peace officer is a Class 6 felony. A.R.S. § 13-2508(B). The statute "plainly states that 'a person commits *resisting* arrest by intentionally *preventing* or attempting to *prevent*' an arrest by a police officer if either (A)(1) or (A)(2) is satisfied." *State v. Lee*, 217 Ariz. 514, 176 P.3d 712 (Az.Ct.App. 2008) (quoting A.R.S. § 13-2508(A) (emphasis in original)).

---

[65] This statute was amended in 2010 but the amendment did not change the 2001 version that is applicable to this case.

[T]he language of subsection (A)(1) does not require any particular type of physical conduct so long as that conduct qualifies as "physical force against the peace officer or another." A.R.S. § 13-2508(A)(1). Those who use physical force against police officers attempting to arrest them are not entitled to engage in "minor scuffling" whether it is usual or unusual in the context of an arrest. This is consistent with our prior decisions. See *State v. Stroud*, 207 Ariz. 476, 480-81, ¶¶ 15-17, 88 P.3d 190, 194-95 (App.2004) (In attempting to flee from an arrest, the defendant was "kicking his feet" and "pushing on [the officer's] arm."), *rev'd on other grounds*, 209 Ariz. 410, 103 P.3d 912 (2005); *State v. Sorkhabi*, 202 Ariz. 450, 451-52, ¶¶ 2, 9-10, 46 P.3d 1071, 1072-73 (App.2002) (conviction for resisting arrest appropriate when "defendant struggled with" the arresting officers). . . .

*Lee*, 217 Ariz. at 517, 176 P.3d at 715 ("Lee's conduct in jerking her arm away from the officers, physically resisting the placement of the handcuffs, and kicking the officers after the handcuffs were placed, meets the (A)(1) requirement.").

Arizona law also criminalizes the failure to comply with a police officer's lawful order as a Class 2 misdemeanor, carrying up to fours months in jail.[66] A.R.S. § 28-622(A) ("A person shall not wilfully fail or refuse to comply with any lawful order or direction of a police officer invested by law with authority to direct, control or regulate traffic.")  In 2009, the Arizona Court of Appeals in *State v. Gonzalez*, 221 Ariz. 82, 84, 210 P.3d 1253, 1255 (Az.Ct.App. 2009) determined that the misdemeanor offense of Failure to Obey a Police Officer pursuant to A.R.S. § 28-622 "requires proof that: (1) a person (2) wilfully (3) failed or refused to comply with (4) any lawful order or direction (5) of a police officer invested by law with authority to direct, control or regulate traffic." 210 P.3d at 1255. Thus, A.R.S. § 28-622(A) is not limited to police orders related to controlling or regulating vehicular traffic and Plaintiff does not challenge whether Officer Mitchell had such authority.[67]

---

[66] See, A.R.S. 13-707(A)(2) ("For a class 2 misdemeanor, four months.").

[67] Under Arizona law, DPS "patrolmen are vested with the authority of peace officers, primarily for the purpose of enforcing laws relating to the use of highways and operation of vehicles thereon." A.R.S. § 41-1741(C).

1    Arizona law criminalizes Reckless Driving[68] as a Class 2 misdemeanor. The

2    crime of Endangerment is either a Class 6 felony or Class 1 misdemeanor and proscribes

3    "recklessly endangering another person with a substantial risk of imminent death or physical

4    injury[,]" A.R.S. § 13-1201(A), which may be charged against the operator of a motor

5    vehicle. *State v. Duda*, 2008 WL 3846314 (Az.Ct.App. 2008).

6    Even viewing the record in the light most favorable to Plaintiff as the Court

7    must, the record contains sufficient undisputed material facts to establish probable cause to

8    believe that Plaintiff committed one or more of the following crimes: the failure to comply

9    with Officer Mitchell's lawful order to exit the vehicle, Endangerment, Reckless Driving, and

10   Resisting Arrest. First, Officer Mitchell was clearly authorized to order Plaintiff out of the

11   vehicle to a safer location away from traffic to question Plaintiff and investigate Plaintiff's

12   wrong-way driving in the eastbound one-way lanes on I-8 and, at a minimum, issue Plaintiff

13   a civil traffic violation for, among others, driving the wrong way on the freeway.[69] When

14   Plaintiff refused to cooperate with Officer Mitchell's order to exit the vehicle, a lawful order,

15   and then actively resisted[70] the two officers' efforts to arrest him, the officers had probable

16   _____

17   [68] A.R.S. 28-693(A) provides that "[a] person who drives a vehicle in reckless disregard for
     the safety of persons or property is guilty of reckless driving."

18

19   [69] A.R.S. §28-728(B) provides that "[o]n a roadway designated and signposted for one-way
     traffic, a person shall drive a vehicle only in the direction designated." A.R.S. §28-728(B).

20   Arizona law also requires the driver of a motor vehicle to "[o]bey the instructions of an
     official traffic control device applicable to the driver that is placed in accordance with

21   [Arizona law]. A.R.S. § 28-644(A)(1). Although the record does not disclose the signage on
     I-8 near the scene, the photographs depict, and the parties do not dispute, that I-8 near the

22   scene is a divided freeway with two lanes eastbound only and two lanes westbound only.

23

24   [70] The Court disagrees with Plaintiff's characterization that Plaintiff's conduct while sitting
     in the stopped vehicle was "passive resistence." In a case with remarkably similar facts,

25   *Brooks v. City of Seattle*, 599 F.3d 1018, 1029 (9th Cir. 2010), the Ninth Circuit concluded
     that when Brooks "grasped the steering wheel and wedged herself between the seat and

26   steering wheel, and she refused to get out of the car when asked. . . [she was] 'actively
     resistant' because she employed force to defeat the Officers' attempts to control her. Our

27   precedent also classifies Brooks's conduct as active resistance. *See* [*Chew v. Gates*, 27 F.3d

28   1432, 1442 (9th Cir. 1994)] (hiding and fleeing is resisting arrest and offering physical

cause to arrest Plaintiff for violations of, at least, A.R.S. §§ 28-622(A) and 13-2508(A).  If not before then certainly at the moment Plaintiff told Officer Mitchell "no" he would not follow Officer Mitchell's order to exit the vehicle, probable cause existed that based on "the facts and circumstances within [Officer Mitchell's] knowledge and of which [Officer Mitchell] had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [Plaintiff] had violated [A.R.S. § 28-622(A)]." *Hunter*, 502 U.S. at 228.

Although the Court finds that the officers had probable cause to arrest Plaintiff and are entitled to summary judgment on Plaintiff's unlawful arrest claim, the Court is still required to determine whether, under the circumstances, the arresting officers used an unreasonable amount of force when taking Plaintiff into custody. *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004) ("Because the excessive force and false arrest factual inquiries are distinct, establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa.").

**2. Excessive Force**

Allegations of excessive force are examined under the Fourth Amendment's prohibition on unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001). "The Fourth Amendment does not prohibit the use of reasonable force during an arrest." *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1095 (9th Cir. 2006) (citing *Graham*, 490 U.S. at 396). Reasonableness is judged from the perspective of a reasonable officer on the scene, making allowances for the split-second judgments officers are required to make in "tense, uncertain, and rapidly-evolving" situations. *Graham*, 490 U.S. at 396-97. To determine whether law enforcement officers used excessive and, therefore, "unreasonable" force in the course of an arrest, the Ninth Circuit requires a court to conduct a three-step analysis. *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003) (quoting *Graham*, 490 U.S. at 396). "First, we assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating

resistance to an officer's efforts constitutes a greater level of active resistance)."

the type and amount of force inflicted." *Id*.  Second, the court analyzes "the importance of the government interests at stake by evaluating: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id*. Whether the force was excessive depends on "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 at 397; *Lolli v. County of Orange*, 351 F.3d 410, 415 (9th Cir. 2003).

The Ninth Circuit has made clear that the "inquiry is not limited to the specific *Graham* factors, . . . [the court] must look to whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*, and then must consider 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994) (quoting *Graham,* 490 U.S. at 396); *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005)).

### A. Amount of Force Used

The Court and the parties have the benefit of three 2010 Ninth Circuit cases dealing with § 1983 excessive force claims against police officers' using a Taser: *Mattos v. Agarano*, 590 F.3d 1082 (9th Cir. 2010) (*per curiam*) (holding that the use of a Taser in stun mode on a suspected domestic violence victim while attempting to arrest her husband did not amount to excessive force); *Brooks v. City of Seattle*, 599 F.3d 1018, 1025 (9th Cir. 2010) (use of a Taser in stun mode on a pregnant driver who resisted her arrest for failing to sign a traffic ticket did not amount to excessive force); and *Bryan v. McPherson*, 608 F.3d 614 (9th Cir. 2010) (holding that shooting a Taser's electrical dart into a bizarre-acting, half-naked plaintiff providing no resistance or threat to the officer after plaintiff was stopped for a seatbelt violation constituted excessive force but the officer was entitled to qualified immunity because "a reasonable officer confronting the circumstances faced by [the officer] on July 24, 2005, could have made a reasonable mistake of law in believing the use of the [T]aser was reasonable.").

The *Mattos* court noted that "the Taser, in general, is more than a non-serious or trivial use of force but less than deadly force," and noted that "[u]nfortunately, there is a lot of room between these end points." 590 F.3d at 1087. *Mattos* is not helpful to the Court on the issues of amount of force used and the severity of any injuries sustained because the record in *Mattos* on this point was not sufficiently developed. *Id.* The facts presented, however, did reflect that plaintiff's wife was not resisting arrest and may have only touched one of the officers before she was tased, causing "'an incredible burning and painful feeling locking all of [her] joints,' . . . heard herself scream, and felt herself fall to the floor." *Id.* The court had "no difficulty concluding that the Taser stun was a serious intrusion into the core of the interests protected by the Fourth Amendment: the right to be "secure in [our] persons." *Id.* Nevertheless, the court concluded that the force used against the wife was reasonable within the meaning of the Fourth Amendment because she "interfered with [plaintiff's] arrest and, in doing so, made contact with [an officer who] was justified in removing her from [plaintiff's] side. Although an alternative method of force may have been advisable, the Fourth Amendment does not require an officer to use the minimum amount of force necessary to move [her] and arrest [plaintiff]." *Id.* at 1089.

In *Brooks*, the court observed that "[t]he use of the Taser in "drive-stun" mode is painful, certainly, but also temporary and localized, without incapacitating muscle contractions or significant lasting injury." 599 F.3d at 1027. The court distinguished a Taser's stun mode from its dart mode:

> [T]he use of the Taser in drive-stun mode - as opposed to dart mode - seems unlike the force used in *Bryan* or uses of force which this court has previously considered severe. See, e.g., *Davis* [*v. City of Las Vegas,* 478 F.3d 1048, 1055 (9th Cir. 2007)] (holding that the force used was "extremely severe" when officer slammed suspect head-first into the wall, breaking his neck, then pressed to the ground by the officer's knee and punched); *Smith*, 394 F.3d at 701-02 (severe when officers pepper sprayed suspect four times and sicced a police dog on him three times while he was pinned down, then failed to rinse the spray from his eyes and bite wounds). Indeed, the amount of force here was more on par with pain compliance techniques, which this court has found involve a "less significant" intrusion upon an individual's personal security than most claims of force, even when they cause pain and injury. *Forrester* [*v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994)] (considering pain compliance techniques that caused bruises, pinched nerves, and a broken wrist). Although certainly a "serious intrusion," *Mattos*, 590 F.3d at 1087,

- 24 -

1        when compared to the far more serious intrusion in *Bryan*, *we find the*
2        *quantum of force here to be less than the intermediate.*

3  *Id*. at 1027-28 (footnote omitted) (emphasis added). Thus, the *Brooks* court found the amount
4  of force used by the officers was "less than the intermediate," resulting in "tremendous pain,"
5  "burn marks and . . . scars on her upper arm and thigh, which is certainly not insignificant,
6  but these injuries are far less serious than those inflicted on Bryan." *Id*. at 1021, 1027.

7        The *Bryan* decision is not particularly helpful on the amount of force issue
8  because the facts there are significantly different than here. Although Bryan was not resisting
9  arrest and refused to comply with the officer's order to stay in his vehicle, he was simply
10 standing outside his vehicle, not threatening the officer or anyone else, when the officer shot
11 him with a Taser X26[71] in the dart mode, causing "Bryan [to lose] muscular control and [fall],
12 uncontrolled, face first into the pavement." 608 F.3d at 620. "This fall shattered four of his
13 front teeth and caused facial abrasions and swelling. Additionally, a barbed probe lodged in
14 his flesh, requiring hospitalization so that a doctor could remove the probe with a scalpel."
15 *Id*. "We therefore conclude that tasers like the X26 constitute an 'intermediate or medium,
16 though not insignificant, quantum of force.'" *Id*. at 622 (citations omitted).

17       Of course, the use of the Taser four times in the stun mode on Plaintiff was not
18 the only force applied to him during his arrest. Because Plaintiff refused to cooperate with
19 the officers, failed to comply with Officer Mitchell's command to exist the vehicle and
20 resisted the officers' efforts to physically remove him from the vehicle, the three officers
21 used their combined strength to overcome Plaintiff's efforts to resist the placement of his
22 arms behind his back. Plus, Deputy Carr used a metal baton for leverage and hit Plaintiff's
23 shoulder or arm with his fist before the officers were able to place Plaintiff in handcuffs and
24 leg restraints. This was significantly more force used than the court described in *Brooks*, 599

---

25 [71] "The X26 uses compressed nitrogen to propel a pair of 'probes' - aluminum darts tipped
26 with stainless steel barbs connected to the X26 by insulated wires - toward the target at a rate
27 of over 160 feet per second. Upon striking a person, the X26 delivers a 1200 volt, low
    ampere electrical charge through the wires and probes and into his muscles." *Bryan*, 608
28 F.3d at 620 (footnotes omitted).

1   F.3d at 1021, and less force than that used by the officers on a cooperative, handcuffed

2   Graham, knowing he was a diabetic, yet they "grabbed Graham and threw him headfirst into

3   the police car[,]" ignoring his pleas for sugar and refusing to allow him to drink some orange

4   juice offered by a friend. 490 U.S. at 389.[72]

5   Plaintiff contends he sustained multiple injuries during his arrest, "consisting

6   of multiple contusions, abrasions, soft tissue damage as well as probable subluxation and

7   dislocation of both elbows with possible injury to both shoulders and the cervical spine as

8   well as soft tissue contusions and damage to his dorsal soft tissue structure of the hands . .

9   . mild neuropathy of the radial nerves on both . . . of Plaintiff's arms secondary to handcuffs

10  [with] no [foreseeable] 'significant improvement' from the status of Plaintiff as documented

11  on the date of exam: September 30, 2009."   PSOFOCDSOF, ¶ 84, doc. 84 at 17-18.

12  According to one of his physicians, "Plaintiff has sustained a 13% permanent impairment of

13  each upper extremity based on the flexion and extension contractures of both elbows." *Id.*

14  The Court has little trouble concluding that Officer Mitchell, Deputy Burke and

15  Deputy Carr, collectively, used a significant level of non-deadly[73] force on Plaintiff to

16  effectuate his arrest.

17  **B. Severity of the Crime**

18  Officer Mitchell and the Deputies did not take Plaintiff into custody for a mere

19  civil traffic violation or for simply refusing to sign a traffic citation promising to appear in

20  traffic court as in *Brooks*. 599 F.3d at 1028. The officers had probable cause to believe that,

21  pursuant to A.R.S. § 13-1201(A), Plaintiff endangered the eastbound motoring public by

22

23  [72] During his encounter with the police, Graham sustained a broken foot, cuts on his wrists,

24  a bruised forehead, and an injured shoulder. He also developed a loud ringing in his right ear
    that was likely permanent that he related to the force used during his arrest. *Graham*, 490

25  U.S. at 390.

26  [73] The *Bryan* court concluded "that tasers and stun guns fall into the category of non-lethal

27  force." 608 F.3d at 621 (citations omitted). It also recognized "that like any generally
    non-lethal force, the taser is capable of being employed in a manner to cause the victim's

28  death." *Id.* at footnote 7 (citations omitted).

driving the wrong way on I-8 or committed reckless driving in violation of A.R.S. 28-693(A). Endangerment is a serious offense because such conduct has the potential to cause serious injury or death. There is no evidence, however, that Plaintiff's one way driving caused any automobile accidents or injuries. Unfortunately, Plaintiff's apparent inability to communicate he was having a medical emergency, failure to cooperate with the officers, and failure to comply with Officer Mitchell's order to exit the vehicle deteriorated the situation to Plaintiff resisting his arrest. Resisting Arrest is a similar crime to obstructing a police officer in the exercise of his official duties in *Brooks*. The court in *Brooks* found that "obstructing an officer is a more serious offense than the traffic violations, it is nonetheless not a serious crime." *Id.* Similarly, the Court concludes that Plaintiff was not arrested for committing a serious crime.

### C. Threat Posed to Officers or Bystanders

"The threat posed is the most significant *Graham* factor." *Brooks*, 599 F.3d at 1028 (citing *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). At the time Officer Mitchell confronted Plaintiff, Plaintiff's vehicle was stopped partially on the shoulder of the inside lane facing against eastbound traffic, the engine was turned off, and the keys were on the dash. Plaintiff posed no danger to the officers because he never used or threatened force against the officers. Although Officer Mitchell may not have been certain there was not another set of keys hidden nearby, once Officer Mitchell placed the keys in his pocket he knew Plaintiff could not drive off and could not have injured anyone with Plaintiff's vehicle. Even if Plaintiff had access to another set of keys, it is clear that Officer Mitchell and Deputy Burke were not going to let Plaintiff place them in the ignition to start up his vehicle and harm anyone with it. Nevertheless, Plaintiff posed "some threat" to the officers, particularly given Plaintiff's refusal to leave the pickup truck and his state of agitation in the truck and on the ground, screaming and kicking, increasing the likelihood that Plaintiff might assault one of the officers. *Brooks*; 599 F.3d. at 1028; *Mattos*, 590 F.3d at 1087-88 (concluding that plaintiff's obstruction of her husband's arrest made it more likely that her husband would assault the officers)

Unlike the location of plaintiff's arrest in *Brooks*,[74] the scene of Plaintiff's arrest elevated the risk of injury to the officers, other motorists and Plaintiff if, in his agitated state, he ran out into moving traffic. Plaintiff's arrest occurred near the middle of a busy, high-speed freeway, resulting in traffic backing up and merging into one lane because Deputy Burke's marked police vehicle and Plaintiff's pickup truck obstructed the inside eastbound lane. It was reasonable for Officer Mitchell to ask Plaintiff to exit the vehicle so the officers and Plaintiff could step away from the traveled portion of the freeway to a safer location onto the narrow shoulder of the freeway or away from the freeway bridge itself to discuss Plaintiff's wrong-way driving and thereby reduce the risk of injury to Plaintiff and the officers.

As the *Brooks* court stated, "a suspect who repeatedly refuses to comply with instructions or leave her car escalates the risk involved for officers unable to predict what type of noncompliance might come next." *Id.* at 1028-29. Like Brooks, by Plaintiff remaining in his vehicle, resisting the officers' gradual efforts to remove him from his vehicle "reveals that [Plaintiff] was not under their control." *Id.* at 1029. Finally, as with the Washington legislature's action in making obstructing an officer a gross misdemeanor, Arizona's Resisting Arrest statute, which carries a presumptive sentence of one year in prison,[75] "suggests that [Plaintiff] posed the sort of threat that it was appropriate to remove from the streets." A.R.S. § 13-2508(B). The Court concludes that, while Plaintiff was not a great threat to the officers, he posed a sufficient threat to the officers and other motorists due his unpredictable agitated state, that Plaintiff's non-compliance with Officer Mitchell's orders and resisting arrest on a high-speed freeway weigh in favor of a finding that the officers' significant level of non-deadly force was not excessive.

---

[74] Brooks was stopped for speeding in a low-speed school zone likely in a residential area. *Brooks*, 599 F.3d at 1028.

[75] A Class 6 felony carries a presumptive sentence of one year in the Arizona Department of Corrections. A.R.S. §§ 13-702(D), 701(A).

**D. Resistance to Arrest and Risk of Flight**

Though Plaintiff's risk of flight in his vehicle was practically nil with the vehicle's keys in Officer Mitchell's pocket, no reasonable juror would deny from the evidence that Plaintiff resisted his arrest while in his vehicle and on the ground. Plaintiff does not dispute that he refused to get out of the car when asked by Officer Mitchell and that Plaintiff grasped the steering wheel, and locked his legs in such a fashion that two officers could not physically remove him from his vehicle until Officer Mitchell used his Taser in stun mode. According to established Ninth Circuit precedent, Plaintiff was "actively resistant" because he employed force to defeat the officers' attempts to remove him from his vehicle and to control him while on the ground. *Chew*, 27 F.3d at 1442 (hiding and fleeing is resisting arrest and offering physical resistance to an officer's efforts constitutes a greater level of active resistance). While Plaintiff's resistance on the ground was not violent or overtly aggressive, those aspects, as *Brooks* points out, are more relevant to the second *Graham* factor. The Court finds that Plaintiff's active resistance weighs in favor of a finding the force used was not excessive.

**E. Totality of the Circumstances**

In addition to the *Graham* factors described above, a consideration of the totality of the circumstances may look to other factors. *Brooks*, 599 F.3d at 1029; *Forrester*, 25 F.3d at 806 n. 2 (9th Cir. 1994). Plaintiff's after-the-fact speculation fails to address what else the officers could reasonably have done in the situation that confronted them at that moment, when the officers believed it was safer to get the Plaintiff out of his vehicle and away from a potentially dangerous location on the freeway to question Plaintiff. Plaintiff argues that, had Officer Mitchell asked Plaintiff for his wallet, he would have learned Plaintiff was a diabetic from the card in his wallet. It is sheer speculation, however, that Plaintiff would have produced his wallet when asked to do so when Plaintiff unquestionably failed to comply with Officer Mitchell's request to exit the vehicle. The issue is whether the officers acted reasonably under settled law in the circumstances, "not whether another reasonable, or more reasonable, interpretation of the events can be constructed [over two]

1    years after the fact." *Hunter*, 502 U.S. at 228.

2            The evidence supports, at a minimum, that Officer Mitchell gave Plaintiff a

3    visual warning, if not a verbal one as well, before escalating to more serious force by Officer

4    Mitchell's use of his Taser because Plaintiff continued to resist the officers' attempts to

5    remove Plaintiff from his vehicle. *Deorle*, 272 F.3d at 1284 (stating that officers should

6    "provide warnings, where feasible, even when the force used is less than deadly."). Unlike

7    *Graham* and *Franklin*, 31 F.3d at 876, however, the officers did not know Plaintiff was a

8    diabetic or that he was experiencing a medical emergency.

9            Plaintiff has retained a "police practices expert," D.P. Van Blaricom, who has

10   prepared a written report in this case.[76] His opinions include, among others, 1) that Plaintiff

11   was "a victim of objectively unreasonable excessive force" at the hands of the Defendant

12   officers, 2) that "Plaintiff was not engaged in any criminal behavior and was neither a threat

13   to the officers nor attempting to flee," 3) "'[A]ny force . . . was unnecessary and therefore

14   unreasonable per se,'" and 4) "[T]here were no exigent circumstances that required Officer

15   Mitchell to immediately and forcibly take Plaintiff into physical custody, as his vehicle was

16   parked alongside the highway, the engine was not running and the keys were in Officer

17   Mitchell's possession."[77]

18           The opinions of a plaintiff's expert witness in a § 1983 action do not

19   necessarily create a jury question on the issue of qualified immunity. *Carter v. Denison*, 110

20   Fed.Appx. 6, 1 (9th Cir. 2004) (citing *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d

21   1421, 1440 (9th Cir. 1995)) ("Assertions in expert affidavits do not automatically create a

22   genuine issue of material fact."). "[U]nder *Act Up!/Portland v. Bagley*, 988 F.2d 868, 872

23   (9th Cir. 1993) 'if a reasonable officer could have believed that [an officer's actions] were

24   justified' the officer is entitled to qualified immunity. "This is so notwithstanding that

25

26   [76] PSOF at ¶ 132. Defendants do not challenge Mr. Blaricom qualifications as a Rule 702,
27   Fed.R.Evid., expert.

28   [77] PSOF at ¶ 139.

reasonable officers could disagree on this issue . . . ." *Reynolds v. County of San Diego*, 858 F.Supp. 1064, 1074 (S.D.Cal. 1994), *modified on other grounds*, 84 F.3d 1162 (9th Cir. 1996) (quoting *Act Up!/Portland*, 988 F.2d at 872). "Thus, the fact that an expert disagrees with the officer's actions does not preclude a finding that the officer is entitled to immunity." *Id.*

Because qualified immunity involves "mixed questions of law and fact[,]" *Pearson*, 129 S.Ct. at 815, the Court concludes that the opinions of Plaintiff's expert do not assist the Court on the issue of qualified immunity. Rule 702, Fed.R.Evid.; *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1184 (9th Cir. 2002) ("Rule 702 governs the admissibility of expert testimony. Fed.R.Evid. 702. Under Rule 702, expert testimony is admissible if the testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'")

Based on the totality of the circumstances in this case, the Court finds that the officers' conduct did not rise to the level of excessive force. *Arpin v. Santa Clara Valley Trans. Agency*, 261 F.3d 912, 921-922 (9th Cir. 2001) (finding no excessive force when physical force was used to handcuff suspect who had refused to cooperate with an officer's requests for identification and stiffened her arm and attempted to pull free from the officer); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (finding no excessive force when officer used Taser in arresting of an uncooperative suspect for a traffic violation). Because police officers are forced to make split-second decisions about the amount of force that is necessary in a particular situation, in circumstances that are tense, uncertain, and rapidly evolving, the reasonableness of an officer's belief as to the appropriate level of force should be judged from that on-scene perspective. *Saucier*, 533 U.S. at 205. Therefore, Officer Mitchell, Deputy Burke and Deputy Carr are entitled to qualified immunity on the first issue of the *Saucier* analysis. 533 U.S. at 201.

Assuming *arguendo* that Officer Mitchell, Deputy Burke and Deputy Carr used unconstitutional excessive force in arresting Plaintiff, a diabetic experiencing insulin shock, the Court will consider whether the officers are entitled to qualified immunity under the

1    second prong of the *Saucier* analysis. *Id*.

2    **VII. Clearly Established Law**

3              The second prong of the qualified immunity inquiry turns on whether the right
4    allegedly violated, here the right to remain free from excessive police force during a medical
5    emergency, was clearly established at the time of the incident in question, *viz*. March 5, 2008.
6    *Graham*, 490 U.S. at 396. Plaintiff bears the burden of showing that the right in question was
7    clearly established at the time of the incident. *Anderson v. Creighton*, 483 U.S. 635, 644-45
8    (1987); *Robinson v. York*, 566 F.3d 817 (9th Cir. 2009); *Romero v. Kitsap County*, 931 F.2d
9    624, 627 (9th Cir. 1991). Moreover, the right must be clearly established in the context of the
10   circumstances faced by the officers. *Jensen v. City of Oxnard*, 145 F.3d 1078, 1082 (9th Cir.
11   1988). "If the law did not put the officer on notice that his conduct would be clearly
12   unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S.
13   at 202. Qualified immunity protects all but the plainly incompetent or those who knowingly
14   violate the law. *Malley*,  475 U.S. at 341.

15             "The contours of the right in question must be sufficiently clear that a
16   reasonable [police officer] would understand that what he is doing violates that right."
17   *Saucier*, 533 U.S. at 202;  *Anderson*, 483 U.S. at 640. To find that the law was clearly
18   established, "we need not find a prior case with identical, or even materially similar, facts,"
19   but instead must "determine whether the preexisting law provided the defendants with fair
20   warning that their conduct was unlawful." *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d
21   1130, 1136-37 (9th Cir. 2003) (internal quotations and citation omitted). "The relevant,
22   dispositive inquiry in determining whether a right is clearly established is whether it would
23   be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."
24   *Saucier*, 533 U.S. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

25             The question of whether qualified immunity applies is a three-step process.
26   First, the plaintiff must make a *prima facie* showing that the defendant violated a plaintiff's
27   constitutional rights. *Saucier*, 533 U.S. at 201. Second, if the plaintiff proves a constitutional
28   violation, the plaintiff must prove that the law was clearly established. *Id*.  If the district court

determines that the law was not clearly established, the defendant is entitled to qualified immunity. If the court determines that the law was clearly established, the Court then must determine whether, based on the circumstances of each case, the defendant made a reasonable mistake regarding what the law required. *Id*. at 205; *Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007). If the Court finds a reasonable mistake, the defendant is entitled to qualified immunity.

The Plaintiff has not provided, and the Court's independent research has not discovered, any cases that require a police officer to first determine whether a motorist or other person is not experiencing a non-apparent medical emergency before making an arrest and using reasonable force. In fact, there is no evidence that the Defendant officers knew, or that most people would have known, that a nearly unconscious motorist in a hypoglycemic "dream like" state could even operate a motor vehicle. Sleep walk, yes; operate a motor vehicle, no. With the benefit of 20/20 hindsight, the Defendant officers now know that, surprisingly, the later is possible. Plaintiff has offered no authority to suggest that the law had placed the Defendant officers on notice on March 5, 2008 that arresting a motorist who appeared to be under the influence of drugs and resisted arrest but was, in reality, suffering from insulin shock was clearly unlawful. A reasonable officer would not have known that Plaintiff was having a medical emergency, known that he was able to drive a motor vehicle in a "dream-like" state, known that Plaintiff could speak but was not able to rationally communicate, known that Plaintiff could resist arrest yet he was apparently acting on involuntary self-preservation instincts, known that Plaintiff was not a threat if he were simply given his candy or insulin tablets, and - most importantly - known that the use of any force was unnecessary and, therefore, was unlawful because Plaintiff was experiencing a medical emergency and was not under the influence of drugs. The Defendant officers are entitled to qualified immunity under *Saucier*'s second prong - the right at issue was not clearly established at the time of the Defendant officers' alleged misconduct.

**VIII. Conclusion**

After considering the briefing on the issues, the parties' statements of fact, supplemental statement of facts, and viewing the facts in the light most favorable to Plaintiff, the Court finds that Officer Mitchell and Deputies Burke and Carr, and each of them, had probable cause to arrest Plaintiff, did not use unconstitutionally excessive force in arresting Plaintiff, and a reasonable officer confronting the circumstances faced by Officer Mitchell and Deputies Burke and Carr on March 5, 2008 could have made a reasonable mistake of fact in believing the use of force, including the use of a Taser, was reasonable and necessary. Their actions were not "plainly incompetent" and they did not "knowingly" violate the law. *Malley*, 475 U.S. at 341. There is no genuine issue of material fact precluding summary judgment on the basis of qualified immunity. Accordingly, the Court will grant Officer Mitchell's and Deputies Burke's and Carr's summary judgment motions.

**IT IS ORDERED** that Maricopa County Deputy Sheriff Burke's and Carr's Motion for Summary Judgment on Qualified Immunity, doc. 75, is **GRANTED**. The remaining issues raised in this Motion will be addressed at a later time.

**IT IS FURTHER ORDERED** that Defendant Officer Jeffrey Mitchell's Motion for Summary Judgment on qualified immunity, doc. 81, is **GRANTED**. The remaining issues raised in this Motion will be addressed at a later time.

DATED this 20th day of September, 2010.

Lawrence O. Anderson
United States Magistrate Judge